**IN THE COURT OF APPEALS OF IOWA**

No. 15-1524
Filed March 9, 2016

**IN THE INTEREST OF S.D.,**
**Minor Child,**

**J.D., Father,**
        Appellant,

**S.D., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Scott County, Christine Dalton,

District Associate Judge.

        A father and mother appeal separately from the order terminating their

parental rights.  **AFFIRMED ON BOTH APPEALS.**

        Martha L. Cox, Bettendorf, for appellant father.

        Randall McNaughton, Davenport, for appellant mother.

        Thomas J. Miller, Attorney General, and Kathrine S. Miller-Todd, Assistant

Attorney General, for appellee State.

        Jean Capdevila, Davenport, for minor child.

        Considered by Danilson, C.J., and Vogel and Potterfield, JJ.

**DANILSON, Chief Judge.**

A father and mother appeal separately from the order terminating their parental rights. The mother subjected the child to unsavory individuals and failed to provide for the child's safety. The father, a Florida resident, abstained from developing a relationship with the child for years, and chose a lifestyle not conducive to responsible parenting. We find no reason to disturb the juvenile court's rulings and therefore affirm.

**I. Background Facts and Proceedings.**

The child, S.D. (born in August 2004), came to the attention of the Iowa Department of Human Services (DHS) in March 2014 upon a report that the mother had allowed S.D. to be alone and spend the night with two adult males whom the mother knew to be registered sex offenders. S.D. was removed from the mother's care on March 6. The mother was arrested and criminally charged with several counts of felony child endangerment in April 2014.[1]

A child in need of assistance (CINA) hearing was held on May 21, 2014. The father appeared at the hearing. On May 27, the juvenile court entered an order finding the child was a CINA. The court indicated the child's mother and sister's friends had repeatedly sexually abused the child. The court wrote:

> [The child's] mother allowed convicted sex offenders to have unlimited contact with [S.D.] both in her home and in their homes. Even after being advised by the [DHS] of the men's history of child sex offenses, she continued to allow the contact. She facilitated these men in having contact with [S.D.] and other children; including her grandchildren. Several children, including [S.D.], have been videotaped and photographed for child pornography purposes. The mother faces very serious criminal charges as a result of her acts.

---

[1] S.D. was one of the named victims.

In the adjudication order, the court observed the child "has no current relationship with her father." The court continued:

Part of that is because he lives in Florida, but also because of her mother's resistance and interference with the relationship. He is participating in an [Interstate Compact on the Placement of Children] ICPC home study. He very much wants to have contact with his daughter. He is willing to assume custody of her. The [DHS] should discuss his visitation with the child's therapist immediately. If the therapist is in agreement, visitation should start as soon as possible. It will be supervised. The father is directed to write weekly to his daughter through the [DHS] as a way to introduce himself to her.

The court noted R.K., an adult half-sibling of S.D., filed a motion to intervene. R.K. lives in Indiana and expressed interest in being a possible placement for S.D. The court denied the motion to intervene until the results of the sibling's ICPC home study could be completed. The child was to remain in foster care but with another suitable person.[2] Any visits with S.D.'s mother, father, or siblings were to be supervised.

A June 27, 2014 social investigation report authored by Erin Davis indicated S.D. was not having contact with her father, and expressed she did not want to see or speak to him. The father had sent letters and an Easter basket, which DHS retained until a time the therapist determined the child "may be emotionally ready to receive them." The child was working with a therapist in regard to her feelings about her father.

With respect to the father, the June 27 report notes he dropped out of high school, but believed education was important. The father admitted having

---

[2] The first foster family was no longer able to provide care. S.D. was placed with a family with whom she was familiar.

smoked marijuana when "young." He reported having no psychological or emotional issues or diagnosis, and having no family history of substance or alcohol abuse and not having been involved in substance abuse treatment. He did report having been arrested in Florida for possession of an illegal substance, and having a "grand theft charge." He also stated he had been in several Florida correctional facilities. However, Davis was not able to run a criminal background check in Florida and was awaiting an ICPC home study. Davis opined:

> The father . . . has not been an active parent in his daughter's life. It is unclear at this time whether he failed to actively pursue a relationship with his child. He reports he has only seen his daughter on one occasion in the last 5 to 6 years. His daughter, [S.D.] has expressed she does not want to have contact with her father at this time. She reports he has "never been there for her" and that he could have found her if he really tried. The father currently seems motivated to obtain custody of [S.D.]; however it is unclear at this time whether he is a suitable alternative caretaker for [S.D.] He does have a lengthy criminal history, he has not been an active participant in [S.D.'s] life, he appears to have limited financial resources, and he currently resides in another state. DHS contends that more information needs to be gathered in regard to the father in order to make an educated and safe judgment as to whether it would be in [the child's] best interest to be placed in his care.

A dispositional hearing was held on June 30. The child was present, as was the mother. The father participated by telephone. In the July 15 dispositional order, the juvenile court stated the mother was currently incarcerated and her "visits need to be strictly monitored due to her inappropriate conversations and comments." The court also stated the current case plan goal was reunification with the mother; however, a concurrent plan was being implemented due to the mother's impending criminal prosecution. The court

noted the father was waiting for a home study to be done, and it ordered that court funds be used to pay the expense of a psychological evaluation for him.

On July 24, the guardian ad litem (GAL) sought an ex parte order terminating visitation and ordering no-contact between S.D. and her mother or adult sibling, which the court ordered.

R.K. filed another motion to intervene, informing the court the ICPC home study had been completed and approved. A hearing on the motion was held on September 2. On December 2, the juvenile court granted the motion to intervene, stating:

> [R.K.] is the child's biological half-sister. She is an adult. She and her husband have passed a home study in their state of residence. [S.D.'s] mother is facing a very serious criminal charge that may carry a prison. She has been incarcerated for much of this case. The child does not have a relationship with her father. He is requesting placement with him in his home state of Florida. He is trying to reestablish a relationship with his daughter. His home study has yet not been received by the Court. It is unknown what the outcome of the father's home study will be. The Court needs a viable concurrent plan. To be a viable option [R.K.] needs to be a party to this action.

The court, however, observed S.D. "is very happy where she is . . . . placed with a suitable other family, the parents of one of her best friends." That placement allowed the child to remain at her school and connected to her friends. The child was also "open[ing] up to her therapist, revealing a great deal about the level of abuse she suffered in her mother's custody." Understanding the trauma the child faced was "critical." The court found the intervenor "is not well equipped at this time to understand the dynamics of child sexual abuse, the severity of the dysfunction within her own family system, and she is quite ignorant of how best to help her young sister." The court encouraged R.K. to learn more about

surviving sexual abuse, but denied any visitation at the time because S.D. was having a "poor response to the contact," which needed to be explored in therapy.

The court concluded:

> The Court strongly cautions [R.K.] that her actions will be considered by the Court in its designation of a concurrent plan for [S.D.'s] placement. If the child cannot be returned to her mother, the Court will have a strong preference for father and other family as a concurrent plan. But that is only a preference. Wherever [the child] is permanently placed, she must have safety and support to undo the damage that has occurred.

Meanwhile, in August 2014, a criminal no-contact order was entered against the mother regarding S.D. The mother pled guilty to several charges in November 2014 and, in December 2014, she was sentenced to nine years in prison. The no-contact order was re-issued for a period of five years, prohibiting the mother from contacting S.D.

A December 15 GAL report was submitted. The GAL reported S.D. had chosen to speak at her mother's sentencing hearing: "She wanted her mother to know how much she hurt [S.D.] and the other children and ruined their lives. [S.D.] told the Judge that she told her mother what was happening and her mother did not help her." The GAL also reported S.D. had no desire to have contact with anyone in her family, including R.K. The GAL report also states the father "was not approved in his home study. He spent much of the last few months in jail for domestic abuse and other related charges." The GAL recommended the child remain in family foster care.

The juvenile court entered a dispositional review order on December 22 in which the court states the child was present at the hearing and spoke privately to the judge in the presence of the GAL. The father participated in the hearing by

telephone. The court found the mother was not a placement option as she was in prison; the father "is a stranger" to the child and had been in jail recently and unable to secure a psychological evaluation; and the child had a "strong preference not to be placed with family," including R.K. The court ruled:

> [S.D.] knows she can trust her current caretakers but is not sure any of her family can be trusted. The Court is concerned whether [R.K.] is equipped to deal with [S.D.'s] issues appropriately.
>
> Based on the foregoing, an evaluation of the needs of the child, the resources and capabilities of the parents, the efforts made by the parents to rectify the situation, and the risk of continued adjudicatory harm, the Court determines that placement of the child in the home would be contrary to the welfare of the child. The Court further determines based on the foregoing that reasonable efforts were made to prevent placement of the child out of the child's home.
>
> The child should remain placed in the custody of the Department of Human Services with placement with suitable other persons, namely [her current placement.] . . . The services outlined in the case plan also constitute reasonable efforts to attain the permanency goals established in the case plan. The parties are not requesting additional services.

The next review hearing was held on February 16, 2015. On February 12, before the review hearing, the GAL submitted a report. The GAL reported the father's whereabouts were unknown; he had been in jail in Florida, was released on probation, and "then dropped out of sight." The GAL stated R.K. was requesting custody of the child, and the child was aware of this and "is adamant she does not want to be with [R.K.]" The GAL reported the child wanted to continue to live with the foster family.[3] The GAL recommended termination of both parents' parental rights and that no extension be granted to any party

---

[3] The foster family had informed the court they could provide a long-term placement for her.

because permanency for the child was needed and reunification was not in the child's best interests.

Davis, the social worker, also submitted a report, noting the father's whereabouts were unknown. Davis concluded,

> The biological father . . . lives out of state, his whereabouts are not known, he has an outstanding warrant for a probation violation, and has a lengthy criminal history. DHS contends the father cannot demonstrate he can be an appropriate caretaker for [S.D.] within the permanency time frames established by law.

Davis recommended termination of parental rights and that the permanency goal be changed to adoption.

On March 9, 2015, the juvenile court entered a permanency order, finding, in part,

> The Department has offered this family visitation and FSRP services directed at education regarding child safety. Mental health referrals were made for the mother and individual therapy to [S.D.] The father was referred to substance abuse evaluation and an ICPC home study. Despite the offer of the above services neither has completed the case plan goals. Additional time and services are unlikely to change the prognosis in the next few months for either parent. The Court knows of no additional services that should have been offered to the father or mother. The parents made no request for services that were not provided except for the mother's request for visitation to continue with her daughter.

The court rejected R.K.'s request that the child be placed with her, noting the child's age, level of maturity, and adamant objection to living with her. The case plan goal was changed to adoption.

A petition to terminate parental rights was filed on May 13, 2015, alleging termination was appropriate under Iowa Code section 232.116(1)(a), (b), (d), (e),

(f), (i), (j), and (m) (2015).[4] The mother remained in prison, and the father's whereabouts were unknown because he had had no contact with DHS since December 2014.

---

[4] In relevant part, Iowa Code section 232.116(1) provides a court may terminate parental rights if:

  a. The parents voluntarily and intelligently consent to the termination of parental rights and the parent-child relationship and for good cause desire the termination.

  b. The court finds that there is clear and convincing evidence that the child has been abandoned or deserted.

  . . . .

  d. The court finds that both of the following have occurred:

  (1) The court has previously adjudicated the child to be a child in need of assistance after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents, or the court has previously adjudicated a child who is a member of the same family to be a child in need of assistance after such a finding.

  (2) Subsequent to the child in need of assistance adjudication, the parents were offered or received services to correct the circumstance which led to the adjudication, and the circumstance continues to exist despite the offer or receipt of services.

  e. The court finds that all of the following have occurred:

  (1) The child has been adjudicated a child in need of assistance pursuant to section 232.96.

  (2) The child has been removed from the physical custody of the child's parents for a period of at least six consecutive months.

  (3) There is clear and convincing evidence that the parents have not maintained significant and meaningful contact with the child during the previous six consecutive months and have made no reasonable efforts to resume care of the child despite being given the opportunity to do so. . . .

  f. The court finds that all of the following have occurred:

  (1) The child is four years of age or older.

  (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.

  (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.

  (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

  . . . .

  i. The court finds that all of the following have occurred:

  (1) The child meets the definition of child in need of assistance based on a finding of physical or sexual abuse or neglect as a result of the acts or omissions of one or both parents.

On July 20, 2015, a different DHS social worker than had been working with the family, Kerri Griffiths, sent a letter to the father at a Florida correctional facility which states,

> I understand you are due to be released from jail on or around 7/30/15.  Please contact me at your earliest convenience to speak about your situation and your daughter's Juvenile Court Case.  The next hearing is on 8/25/2015 at 1:30 pm . . . .  This is a Termination of Parental Rights Hearing.
>
> I need to know immediately upon your release about how you plan to proceed with your living arrangements and how you plan to make yourself available for your daughter as a safe parent.

On July 30, the father telephoned DHS and reported he would be in Iowa in August and wished to have visits with S.D.  On August 24, 2015—the day before the termination trial—the father arrived at the Iowa DHS office with his attorney and asked to visit S.D.  DHS did not recommend that a visit occur.

---

(2) There is clear and convincing evidence that the abuse or neglect posed a significant risk to the life of the child or constituted imminent danger to the child.

(3) There is clear and convincing evidence that the offer or receipt of services would not correct the conditions which led to the abuse or neglect of the child within a reasonable period of time.

j. The court finds that both of the following have occurred:

(1) The child has been adjudicated a child in need of assistance pursuant to section 232.96 and custody has been transferred from the child's parents for placement pursuant to section 232.102.

(2) The parent has been imprisoned for a crime against the child, the child's sibling, or another child in the household, or the parent has been imprisoned and it is unlikely that the parent will be released from prison for a period of five or more years.

. . . .

m. The court finds that both of the following have occurred:

(1) The child has been adjudicated a child in need of assistance pursuant to section 232.96 after finding that the child has been physically or sexually abused or neglected as a result of the acts or omissions of a parent.

(2) The parent found to have physically or sexually abused or neglected the child has been convicted of a felony and imprisoned for physically or sexually abusing or neglecting the child, the child's sibling, or any other child in the household.

The termination trial was held on August 25, 2015. The father testified he went to jail on July 27, 2014, and was released on December 24. He was again incarcerated in January 2015 and released on July 30, 2015. He stated he nonetheless wished to be a parent and blamed his lack of involvement with the child on the mother. He submitted copies of numerous letters he had written to S.D.—all of which were written while he was incarcerated.

The mother has a tentative release date in May 2018. The mother continues to express no understanding of how her acts of allowing sex offenders access to the children in her care creates a risk of harm to the child.

Following the trial, the juvenile court found the mother "is a dangerous woman whose ignorance resulted in several children suffering repeated horrendous abuse." The court terminated her parental rights pursuant to section 232.116(1)(b), (d), (e), (f), and (i). With respect to the father, the juvenile terminated his rights pursuant to section 232.116(1)(b), (e), and (f).

Both parents appeal.

**II. Scope and Standard of Review.**

We conduct a de novo review of termination of parental rights proceedings. *In re H.S.*, 805 N.W.2d 737, 745 (Iowa 2011). Although we are not bound by the juvenile court's findings of fact, we do give them weight, especially in assessing the credibility of witnesses. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). An order terminating parental rights will be upheld if there is clear and convincing evidence of grounds for termination under section 232.116. *Id.* Evidence is considered "clear and convincing" when there are no "serious or

substantial doubts as to the correctness or conclusions of law drawn from the evidence." *Id.*

## III. Discussion.

*A. Mother's appeal.* The mother contends she did not abandon S.D. and objects to termination of her parental rights pursuant to section 232.116(1)(b). She also contends the court erred in finding that services had been offered to her to correct the situation that led to the CINA adjudication so termination under paragraph "d" was not appropriate. She further objects to a finding under paragraph "e" because she disagrees she had an opportunity to resume care of her child. When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record. *D.W.*, 791 N.W.2d at 707. Because the mother does not dispute the existence of the grounds under sections 232.116(1)(f), we may rely on this ground and we need not address the other grounds. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

The mother also contends termination of her parental rights is not in the child's best interests, and the closeness of the parent-child bond weighs against termination. We disagree. The child testified at the mother's sentencing hearing to explain how she felt her mother's actions or inactions had harmed her life. We conclude this act by the child speaks powerfully about a mother-daughter relationship that no longer requires preservation. This child is in need of permanency now, and the mother's claim of a bond between mother and child is not reflected in the record.

*B. Father's appeal.* The father challenges the finding that he abandoned his child (section 232.116(1)(b)) or failed to maintain significant and meaningful contact (paragraph "e"). He claims there is no basis for termination under paragraph "f" as it pertains to him. He also challenges the finding that termination of his parental rights was in the child's best interests, and DHS failed to make reasonable efforts to establish a relationship between him and S.D.

The record belies the father's claims. As found by the trial court, the father had face-to-face contact with the child twice during her life and perhaps ten phone contacts. The court wrote, "He claimed lack of knowledge of her whereabouts, which may be true, but he took no steps to locate [the child] over the many years of her life." Moreover, he was informed of the child's address in 2012 (by way of receipt of a child abuse investigation report involving S.D.) and made no attempt to contact the child until 2014 after the CINA proceedings had begun. During the CINA proceedings he was in jail and unavailable for several months. For purposes of section 232.116(1)(e),

> "significant and meaningful contact" includes but is not limited to the affirmative assumption by the parents of the duties encompassed by the role of being a parent. This affirmative duty, in addition to financial obligations, requires continued interest in the child, a genuine effort to complete the responsibilities prescribed in the case permanency plan, a genuine effort to maintain communication with the child, and requires that the parents establish and maintain a place of importance in the child's life.

We again quote the juvenile court: "It is apparent from [the father's] exhibits . . . that domestic violence and illegal drug usage is a current problem" for him. The father has had several legal problems resulting in jail time during the course of the CINA proceedings, including charges of domestic abuse

assault (with injury), substance abuse, and driving while barred. He also reports having a lengthy criminal record. These are not the actions of a parent who is acting in a child's best interests. The father has not provided support for the child. We find clear and convincing evidence in this record to support termination of the father's parental rights under section 232.116(1)(e) because he has not made this child a priority in his life and has not made genuine efforts to maintain communication or a place of importance in her life, although we acknowledge that he sent some written correspondence while juvenile proceedings were pending.

The father argues that termination of the child's parental rights would best be served by changing the goal to a guardianship and allowing the child to develop a familial identity with her father. This child has waited eleven years for her parents to provide appropriate care and is need of permanency. "[O]ur legislature has carefully constructed a time frame to provide a balance between the parent's efforts and the child's long-term best interests." *D.W.*, 791 N.W.2d at 707. At S.D.'s age, that time frame is one year. *See* Iowa Code § 232.116(1)(f). These juvenile proceedings have gone beyond the statutory time frame. "Ultimately, the issue is not parental culpability but whether the statutory requirements have been met." *In re A.M.*, 843 N.W.2d 100, 111 n.9 (Iowa 2014).

In therapy sessions, the child has expressed she does not wish to meet or have a relationship with the father. She is comfortable and making progress in the care of the foster family. Giving "primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the

child, and to the physical, mental, and emotional condition and needs of the child," we conclude termination of the father's parental rights is in the child's best interests.  *See* Iowa Code § 232.116(2).

We also reject the father's claim that reasonable efforts were not made to reunify him with his child.  The father resided in Florida and was given financial assistance to obtain a psychological evaluation.  An interstate compact home study was attempted.  However, these services and others were thwarted by the father's actions and lifestyle, which rendered him unavailable at the expense of a relationship with his child.

**AFFIRMED ON BOTH APPEALS.**